# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DA'QUAN T. HARRY,

      Plaintiff,

                                Civil Action 2:16-cv-341
vs.                             JUDGE ALGENON L. MARBLEY
                                Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Da'Quan T. Harry, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

On July 19, 2012, Deidra Harry, on behalf of her then minor child, Da'Quan T. Harry, filed an application for SSI alleging that he has been disabled since December 15, 2007. (Doc. 9, Tr. 124–29). After initial administrative denials of Plaintiff's claims, an Administrative Law Judge ("ALJ") held a video hearing on March 20, 2014. Because Plaintiff turned eighteen years-old prior to hearing, the ALJ obtained additional medical and school records to evaluate his application under the adult disability standards as well as the child disability standards. On November 11, 2014, the ALJ issued a decision finding that Plaintiff was not disabled at any time,

within the meaning of the Social Security Act. (*Id.*, Tr. 12–33). On February 22, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (*Id.*, 1–4).

Plaintiff filed this case on April 18, 2016, and the Commissioner filed the administrative record on June 21, 2016. (Doc. 9). Plaintiff filed a Statement of Specific Errors on August 8, 2016 (Doc. 10), the Commissioner responded on September 21, 2016 (Doc. 11), and Plaintiff replied on October 6, 2016 (Doc. 12).

### A.  Personal Background

Plaintiff was born in 1995. His mother filed for benefits when he was sixteen years-old, alleging that Plaintiff has been disabled since December 15, 2007, when he was twelve years-old. Plaintiff turned eighteen in November of 2013. (Doc. 9, Tr. 12, 17, 124). He has a limited educational background and no prior work. (*Id.*, Tr. 32).

### B.  Testimony at the Administrative Hearing

Plaintiff testified at the administrative hearing that he was in the 12th grade, but with an 11th grade status. (*Id.*, Tr. 44). When asked if he was on track to graduate, Plaintiff responded that he was told if he could "get my work up," he probably could graduate that year if he attended summer school. (*Id.*, Tr. 44–45). Plaintiff testified that he was often absent and tardy to school due to transportation issues. (*Id.*, Tr. 45). He further testified that he attended IEP (Individualized Education Program) classes, and that his mother helped him with his homework. (*Id.*, Tr. 46). He admitted that sometimes at school he gets angry with his classmates because they "talk" about him. (*Id.*). He testified that he stopped smoking marijuana the past December and began taking Concerta, a prescription medication. (*Id.*, Tr. 47). The medication, according

to Plaintiff, "[k]eeps [him] calm." (*Id.*). He further testified that he has no trouble taking care of himself. (*Id.*, Tr. 49). For example, he showers and brushes his teeth on his own. (*Id.*)

Plaintiff's mother next testified that Plaintiff has "always had problems in school with his education;" he can't focus and doesn't remember or completely finish what she asks of him; and he has some behavioral problems. (*Id.*, Tr. 55). She also noted Plaintiff gets suspended from school "a lot." (*Id.*). When asked why Plaintiff stopped taking his medication, she responded that he stopped taking it because he was experiencing side effects, such as not sleeping or eating right. (*Id.*, Tr. 58). She further explained that once Plaintiff stopped, he "just never went back to get the prescriptions. And then as he started getting worse that's when I went back and got his medication back." (*Id.*). She testified that she has never seen her son do homework. (*Id.*, Tr. 59). According to her testimony, Plaintiff tells his mother that he either does not have any or that he completed it at school. (*Id.*) Plaintiff's teachers, however, have relayed that he does not complete his homework assignments. (*Id.*).

Because Plaintiff's claim included both child and adult disability standards, Interrogatories were sent to a vocational expert ("VE"). (*Id.*, Tr. 285–90). The ALJ proposed a hypothetical question involving an individual who was born in November 1995, has a limited education and is able to communicate in English, with no work experience, with the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine tasks, simple, short instructions, can make simple decisions, have few work place changes. This individual is not required to read instructions, write reports or perform math calculations as essential functions of the job. The individual can have superficial interaction with coworkers, supervisors, and the public.

Superficial means no need for confrontation or negotiation. (*Id.*, Tr. 288). The VE responded that Plaintiff could perform unskilled jobs in the national economy such a janitor, with 200,000 jobs in the nation; a dishwasher, with 190,000 jobs in the nation; and a packager, with about 200,000 jobs in the nation. (*Id.*, Tr. 289).

### C. Educational Evidence

In assessing Plaintiff for special education under the Individuals with Disabilities Education Act, the evaluation team—consisting of teachers, counselors, a school psychologist, and a therapist—reported in May 2012 that Plaintiff was achieving below grade level in all academic areas. Plaintiff was found to have difficulty with the following: understanding directions read aloud, expressing himself in words, expressing himself in writing, sitting still and paying attention. He has significant difficulty with reading comprehension and basic math skills. They also assessed his social, emotional, and behavioral functioning. Concern was noted in the following areas: hyperactivity, conduct problems, attention problems, learning problems, social skills, leadership, study skills, and functional communication. (*Id.*, Tr. 170).

As part of a comprehensive evaluation, Plaintiff was administered the Woodcock-Johnson Tests of Cognitive Ability-Third Edition (WJ-III COG) on January 31, 2012, with the following results: General Intellectual Ability: 80, Verbal Ability: 80, Thinking Ability: 85, Cognitive Efficiency: 84, Phonemic Awareness: 94, Working Memory: 93. Standard scores between 90 and 110 are considered Average. The school psychologist noted that Plaintiff's cognitive ability is consistent with his previous scores of 72 on the SB-V from 2004 and his score of 85 on the WJ-III COG from 2006. (*Id.*, Tr. 170).

An Individualized Education Program (IEP) was implemented for Plaintiff's ninth grade year in 2012. (Doc. 9, Tr. 131–50). At this time, Plaintiff was in his second year of high school, but was still listed as having freshman status. (*Id.*, Tr. 135). He had failed most of his courses during his first year in high school. (*Id.*). His goal included working to improve his grades and attending school every day and on time. (*Id.*). It was noted that he had a total of 28 absences and 17 tardies. (*Id.*, Tr. 142). The IEP additionally provided for Plaintiff to receive specially designed services, including instruction in reading and math, as well as intervention strategies and behavioral strategies. (*Id.*, Tr. 132–50).

The IEP written in April 2013 for the following school year in 2013–14 showed that during the 2012–13 school year, when Plaintiff was seventeen years-old, he was recovering credits, and if successful, would be on track to graduate during the 2013–14 school year. (*Id.*, Tr. 245–61). He was identified for special education services during the 2011–12 school year and was receiving services under the category of Other Health Impairment (Minor). Plaintiff was receiving instruction in a resource room for all of his core content area classes. (*Id.*, Tr. 247). Because Plaintiff was working below grade level expectations, he received continued interventions in basic reading, reading comprehension, basic math, math application, spelling, and written expression. It was noted that Plaintiff displayed some good fundamental math skills such as adding and subtracting, and some good fundamental reading skills such as sight word recognition and emerging decoding skills. (*Id.*)

On November 13, 2013, Ms. Ryan, a special needs teacher at Plaintiff's high school, completed a questionnaire concerning Plaintiff's six functional domains. (Tr. 216–23). Ms. Ryan reported that she had known Plaintiff for two years, and interacted with him on a daily

basis for almost an hour. (*Id.*, Tr. 216). Ms. Ryan indicated that Plaintiff receives instruction based on a 12th grade curriculum, with significant modifications and accommodations. (*Id.*). In the functional domain of acquire and use information, Ms. Ryan indicated that Plaintiff suffered from serious to very serious problems in every category, reporting that Plaintiff's reading and writing skills were well below grade level, that he cannot independently read at his current grade level, and that a recent assessment put Plaintiff's reading at the second to third grade level. (*Id.*, Tr. 217). Ms. Ryan also noted that Plaintiff's academic deficits contributed to his behavioral problems. (*Id.*). Further, Ms. Ryan noted that Plaintiff exhibited serious to very serious problems in almost every category of attending and completing tasks, reporting that Plaintiff "has terrible difficulty staying focused, following directions and completing tasks." (*Id.*, Tr. 218). She also wrote that he required frequent redirection and prompting, and often appears to be confused. (*Id.*).

### D. Relevant Medical Evidence

Plaintiff attended four consultative evaluations as a child. The first, with Mark Hammerly, Ph.D., occurred on May 13, 2008, when Plaintiff was twelve years-old. (Doc. 9, Tr. 298–307). At the time of this evaluation, Plaintiff was in the sixth grade. Plaintiff's mother reported that "she ha[d] been 'trying to get him' an IEP for many years." (*Id.* at 299). She also reported that Plaintiff had been in two schools that year alone; and she received weekly calls home from the school regarding Plaintiff's behavior. (*Id.*). Dr. Hammerly administered the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV), which resulted in verbal and full scale IQ scores of 59. (*Id.*, Tr. 303). He also noted that Plaintiff put forth good effort and the scores were valid and reliable and expected given the stated academic history. (*Id.*). Dr.

Hammerly reported that Plaintiff's communication was normal, his motor skills were normal, his personal and behavioral patterns were noted as being "at or near his age-appropriate level"; and Plaintiff's concentration, persistence, and pace may be problematic. (*Id.*, Tr. 304). Dr. Hammerly stated that Plaintiff displayed symptoms consistent with Mild Mental Retardation and that the test documented concurrent deficits in present adaptive functioning in at least two major areas. (*Id.*, Tr. 305). He concluded "I would defer to a clinical judgment made by another professional with access to a proper norm–referenced instrument of adaptive functioning, however, but diagnosis of Mild MR is still appropriate today, along with his ADHD which is under moderate control with pharmacological intervention." (*Id.*).

Plaintiff was again evaluated for disability purposes by Scott Donaldson, Ph.D. in July 2008. (*Id.*, Tr. 311–13). Dr. Donaldson administered a Wide Range Achievement Test (WRAT4) which showed Plaintiff functioned at first or second grade level; and the Vineland II Adaptive Behavioral Scale, which revealed a moderately low-level of adaptive behavior. Dr. Donaldson diagnosed Plaintiff with a learning disorder and noted that his behavioral difficulties presented the greatest problems. (*Id.*, Tr. 313).

In March 2011, when Plaintiff was 15 years old, he was evaluated by Jack Kramer, Ph.D. (*Id.*, Tr. 315–19). Dr. Kramer noted that Plaintiff tended to isolate himself and reported that his cognitive and memory skills were below his age level. (*Id.*, Tr. 316). Dr. Kramer diagnosed Plaintiff with ADHD. (*Id.*, Tr. 318). In the ability to acquire and use information, Dr. Kramer noted that Plaintiff was tested when younger, but did not qualify for special education services according to his mother. Academic skills are reported to be harder for him, but he has not worked very hard to improve his skills. He did not say a lot during the evaluation, but

understood questions and formulated answers, but he was not able to answer single-digit multiplication. In his ability to attend to tasks, Dr. Kramer noted Plaintiff appeared to have significant issues with task completion—he is not motivated to do homework or help with household chores. Regarding his ability to interact with others, Plaintiff has been disciplined due to being disrespectful towards teachers and adults. Dr. Kramer found no issues in Plaintiff's ability for self-care. (*Id.* Tr. 317–18).

Plaintiff was seen for a physical by Johanna Tylka, M.D. on February 2, 2012, when he was 16 years old. Plaintiff's mother reported that he was on Concerta for ADHD in 2008–09 but she stopped getting refills. Then in 2011, she was given forms to restart the medication and they were never completed. During this appointment, Plaintiff's mother was again interested in getting him medication. (*Id.*, Tr. 328). Plaintiff reported use of Marijuana weekly. Examination of his back and spine was normal; he was neurologically intact. Plaintiff was assessed with allergic rhinitis, probable ADHD, and a learning disability. (*Id.*, Tr. 328–35).

In October 2012, Albert Virgil, Ph.D. evaluated Plaintiff for disability purposes. (*Id.*, Tr. 344-47). Plaintiff's mother reported him disabled due to ADHD and his symptoms included "Temper, can't focus, hard to remember stuff. He bites his nails." (*Id.*, Tr. 344–45). On mental status examination, Dr. Virgil found Plaintiff's appearance was appropriate, he sat quietly, responded appropriately, his speech was normal and he exhibited good eye contact. Dr. Virgil found Plaintiff performed at the borderline level on the WISC-IV abstract/vocab subtest. (*Id.*, Tr. 345). Dr. Virgil diagnosed Plaintiff with a mood disorder, a learning disorder, and borderline intellectual functioning. (*Id.*, Tr. 346). Dr. Virgil opined that Plaintiff's ability to acquire and use information was impaired. (*Id.*). Plaintiff's ability to attend and complete tasks

was not significantly impaired; his ability to interact with others was not impaired and his ability for self-care was age appropriate. (*Id.*, Tr. 347).

Once Plaintiff turned eighteen, he was evaluated by John Reece, Psy.D. in April 2014. (*Id.*, Tr. 403–06). At the time of this evaluation, Plaintiff reported to be in the eleventh grade. (*Id.*, Tr. 403). On mental status examination, Dr. Reece found Plaintiff's affect to be flat and that his prevailing mood was mild to moderately dysphoric and anxious. (*Id.*, Tr. 404–05). Dr. Reece diagnosed Plaintiff with an unspecified depressive disorder and an unspecified impulse control, disruptive, and conduct disorder. (*Id.*). Dr. Reece completed a medical source statement in which he concluded that Plaintiff's ability to understand, remember and carry out instructions was not affected by his impairment. (*Id.*, Tr. 409). Dr. Reece also concluded that Plaintiff's ability to interact with others was only mildly impaired. (*Id.*, Tr. 410).

On two separate occasions, Plaintiff's childhood disability claim and medical record were reviewed, analyzed, and his limitations evaluated in each of the six functional domains. (*Id.*, Tr. 72–80, 83–91). In October 2012, Robelyn Marlow, Ph.D., the reviewing psychologist considered Plaintiff's ADHD under Listing 112.11. (*Id.*, Tr. 76–77). As to each of the six functional domains, Dr. Marlow assessed the impairment to be "less than marked" or "no limitation" severity and, therefore, she concluded that Plaintiff's condition did not functionally equal a listed impairment.[1] (*Id.*, Tr. 77–78). Dr. Marlow assigned "great weight" to Dr. Virgil's report of functioning. (*Id.*, Tr. 78). Reviewing the updated medical record in January 2013, Mel

---

[1]"By 'functionally equal the listings,'[the agency] mean[s] that [the claimant's] impairment(s) must be of listing level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. 416.926a(a).

Zwissler, Ph.D., a second state agency psychologist, for the same reasons came to the same non-disability conclusion. (*Id.*, Tr. 87–88).

### E.     The Administrative Decision

On November 21, 2014, the ALJ issued an unfavorable decision. (*Id.*, Tr. 12–33). Beginning with the childhood standards of disability, at Steps 1 and 2 of required sequential evaluation, the ALJ found that Plaintiff had not engaged in any substantial gainful activity, and that he had severe impairments of attention deficit hyperactivity disorder, oppositional defiant disorder, learning disorder, and a depressive disorder. (*Id.*, Tr. 17). At Step 3, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that either meets or medically equals a listed impairment. (*Id.*, Tr. 19).

In determining that Plaintiff's impairments were not functionally equivalent to a listed impairment, the ALJ found that Plaintiff's impairments caused a marked limitation in his ability to interact with and relate to others. The ALJ found that Plaintiff was less than markedly impaired or not impaired in the remaining functional areas. (*Id.*, Tr. 21–28).

The ALJ then considered Plaintiff's claim under the adult disability standards. She found that Plaintiff had not engaged in substantial gainful activity since he attained age eighteen in November 2013. (*Id.*, Tr. 28). The ALJ determined that Plaintiff had the following severe impairments: "attention deficit hyperactivity disorder, oppositional defiant disorder, and a depressive disorder." (*Id.*). The ALJ found that he did not, however, meet the requirements of an impairment listed in 20 CFR Subpart P, Appendix 1. (*Id.*, Tr. 29). The ALJ ultimately found that Plaintiff had the RFC to perform all the basic work activities without any exertional limitations subject to the following limitations/restrictions: he can perform simple, routine tasks

so long as the work involves simple, short instructions; and he can make simple decisions; and he is restricted to working in jobs where there are few work-place changes; and to jobs where he would not have to read instructions, write reports or perform math calculations as essential functions of the job; and to jobs where he would have no more than superficial interaction with coworkers, supervisors and members of the public. (*Id.*, Tr. 30). Relying on the VE's response to interrogatories, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy. (*Id.*, Tr. 32–33). She therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since he attained age eighteen. (*Id.*, Tr. 33).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.  DISCUSSION

On appeal, Plaintiff alleges that the ALJ improperly evaluated his childhood disability claim by incorrectly evaluating whether Plaintiff's intellectual impairments met or equaled listing 112.05; and by incorrectly determining that Plaintiff did not functionally equal the listings.  Plaintiff also contends that the ALJ incorrectly evaluated Plaintiff's adult disability claim by failing to evaluate properly his intellectual disability under listing 12.05.  (Docs. 10, 12).

### A.    Functional Domains.

The Court considers Plaintiff's second argument first.  An individual under the age of eighteen shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security Administration ("SSA") uses a three-step process to determine if a child applicant is disabled and entitled to benefits: (1) if the child is engaged in substantial gainful activity, the child is not disabled; (2) if the child does not have a severe medically determinable impairment or combination of impairments, the child is not disabled; and (3) if the child's impairment(s) do not meet, medically equal, or functionally equal the listings, the child is not disabled.  20 C.F.R. § 416.924.

At the third step, an impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  The regulations identify six domains of functioning to be considered: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A claimant has a "marked" limitation if the claimant's impairments seriously interfere with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(2)(i). A "marked" limitation is more severe than "moderate" and less severe than "extreme." 20 C.F.R. § 416.926(e)(2)(i). An impairment causes an "extreme" limitation when it interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(3)(i). In determining the effect of an impairment on the six domains, the Commissioner considers information from medical sources, parents and teachers, and consultative examiners. 20 C.F.R. § 416.926a(b)(3).

Plaintiff argues that the ALJ failed to discuss evidence relevant to his claim. In particular, Plaintiff claims that the ALJ should have given attention to Plaintiff's poor academic performance, his objective IQ results documenting listing level scores, and the opinions from both Plaintiff's special education teacher, Ms. Ryan and consultative examiner, Dr. Virgil, who documented significant problems in acquiring and using information. The Court disagrees with Plaintiff's criticism.

The ALJ found that Plaintiff had problems in the domain of ability to acquire and use information and appropriately identified the evidence showing Plaintiff had problems in this area, citing to Ms. Ryan's questionnaire and Dr. Virgil's opinion diagnosing lower intelligence and a learning disorder, Plaintiff's academic records, and the testimony of Plaintiff and his mother. (*See*, Doc. 9, Tr. 22) (citing to *id.*, Tr. 134–35, 153, 156, 159–60, 162, 168, 217, 225,

226, 234, 247, 255, 264–65). However the ALJ also determined that the record documents cited counseling notes that showed Plaintiff had "ongoing improvement" with his ADHD medication, that "his grades ha[d] been going up," and that he was "passing everything except his French class" by April 2013. (*Id.*, Tr. 358). The ALJ also considered Plaintiff's testimony that he only sometimes had problems focusing in school. (*Id.*, Tr. 22) (citing to *id.*, Tr. 45–46). Similarly, the ALJ considered the testimony of Plaintiff's mother, which indicated that Plaintiff could complete homework but did not turn it in. (*Id.*, Tr. 22, citing to *id.*, Tr. 59).

The ALJ found that Plaintiff's impairments caused a "less than marked" limitation in the domain of ability to acquire and use information. She supported her determination with the opinions of the State agency psychologists, Drs. Marlow and Zwissler. (*Id.*, Tr. 22). The ALJ assigned "great" weight to these opinions because they were uncontradicted and supported by the evidence, specifically noting that Plaintiff's ability to acquire and use information improved after he started taking medication for his attention deficit hyperactivity disorder. (*Id.*, citing to *id.*, Tr. 349, 354, 358, 366). A review of the record therefore indicates that the ALJ's finding is consistent with the findings of Drs. Marlow and Zwissler. As psychological consultants, Drs. Marlow and Zwissler are considered "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." *See* 20 C.F.R. § 416.927(e)(2)(i); SSR 96-6p. Moreover, their findings are uncontradicted.

An ALJ's explanation of her step three determination need not be elaborate. "The Sixth Circuit has consistently rejected a heightened articulation standard, noting in *Bledsoe v. Barnhart* that the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis,' or to discuss every

single impairment." *Stages v. Astrue*, 2011 WL 3444014 at *3 (M.D. Tenn. Aug. 8, 2011) (citing *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006)).

There is substantial evidence in the record to support the ALJ's decision, even though there is evidence to the contrary as well. If substantial evidence supports the ALJ's decision, the Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Therefore, the Court finds that the ALJ did not err in finding that Plaintiff does not meet the second part of step three.

### B.    112.05 of the Listing

Section 112.05 of the Listing specifies the mental retardation category of impairment. This impairment is characterized by significantly sub-average general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirement in A, B, C, D, E, or F are satisfied. Plaintiff argues that he met paragraphs C and D.

C. A valid verbal, performance, or full scale IQ of 59 or less;

or

D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an **additional and significant** limitation of function.

The presence of a mental disorder must be documented on the basis of reports from acceptable sources of medical evidence. Descriptions of functional limitations may be available from these sources, either in the form of standardized test results or in other medical findings supplied by the sources, or both. (Medical findings consist of symptoms, signs, and laboratory findings.) Whenever possible, a medical source's findings should reflect the medical source's

consideration of information from parents or other concerned individuals who are aware of the child's activities of daily living, social functioning, and ability to adapt to different settings and expectations, as well as the medical source's findings and observations on examination, consistent with standard clinical practice. As necessary, information from non-medical sources, such as parents, should also be used to supplement the record of the child's functioning to establish the consistency of the medical evidence and longitudinality of impairment severity.

In children with mental disorders, particularly those requiring special placement, school records are a rich source of data, and the required reevaluations at specified time periods can provide the longitudinal data needed to trace impairment progression over time. Reference to a "standardized psychological test" indicates the use of a psychological test measure that has appropriate validity, reliability, and norms, and is individually administered by a qualified specialist. By "qualified," the SSA means the specialist must be currently licensed or certified in the state to administer, score, and interpret psychological tests and have the training and experience to perform the test. Psychological tests are best considered as standardized sets of tasks or questions designed to elicit a range of responses. Psychological testing can also provide other useful data, such as the specialist's observations regarding the child's ability to sustain attention and concentration, relate appropriately to the specialist, and perform tasks independently (without prompts or reminders). Therefore, a report of test results should include both the objective data and any clinical observations. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Under subsection D, the claimant must have a verbal, performance, or full scale IQ of 60 through 70. Even liberally construing the evidence in Plaintiff's favor, he is not impaired as defined in the mental retardation category of impairment. Plaintiff was administered the

Woodcock-Johnson Tests of Cognitive Ability-Third Edition (WJ-III COG) on January 31, 2012, with the following results: General Intellectual Ability: 80, Verbal Ability: 80, Thinking Ability: 85, Cognitive Efficiency: 84, Phonemic Awareness: 94, Working Memory: 93. Standard scores between 90 and 110 are considered Average. The school psychologist noted that Plaintiff's cognitive ability is consistent with his previous scores of 72 on the SB-V from 2004 and his score of 85 on the WJ-III COG from 2006. (*Id.*, Tr. 170). The general intelligence quotient exceeded the scores necessary to meet any of the median scores necessary to show intellectual inability. The ALJ did not err in failing to consider whether Plaintiff's impairments were consistent with the Listing 112.05 because there was no evidence satisfying the threshold intelligence quotient necessary to meet subsection D of Listing 112.05.

### C. Listing 12.05

Plaintiff's next challenge to the ALJ's decision is that she erred by failing to find that Plaintiff satisfies Listing 12.05. Listing 12.05 for Intellectual Disability requires proof of the following:

Intellectual disability [which] refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

****

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Part 404, Subpt. P, App. 1, § 12.05(C).

To meet Listing 12.05(C), an individual's impairment must satisfy both the diagnostic description of intellectual disability (formerly mental retardation)[2] in the introductory paragraph of the listing and the requirements set forth in subparagraph C. *Id.* at § 12.00A. As explained below, Plaintiff is unable to satisfy his burden of proof. Here, he cannot even show that he meets or equals the diagnostic description of intellectual disability in the introductory paragraph of the listing as no medical source ever conclusively diagnosed him with mental retardation, and even more significantly, the record shows he has not had significant deficits in adaptive functioning which originated prior to age 22.

The ALJ acknowledged Plaintiff's IQ scores through her evaluation of the state agency psychologists' assessments. (*Id.*, Tr. 19). Yet, IQ scores alone cannot show Plaintiff had mental retardation or that he meets or equals the listing. *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (holding that it is not enough for a claimant to reference an IQ score below 71; the claimant must also satisfy the 'diagnostic description' of mental retardation in Listing 12.05."); *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx 692, 698 (6th Cir. 2007) ("The medical evidence also supports the ALJ's conclusion [that claimant did not have the requisite deficits of adaptive functioning]). Rather, the "results of intelligence tests are only part of the overall assessment," and adaptive functioning deficits are the other part. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a). Adaptive functioning involves how effectively an individual copes with common life demands and meets standards of personal independence in areas such as

_____

[2]On August 1, 2013, the SSA amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 F. Reg. 46,499, 46,501 (to be codified at 20 C.F.R. § 404, subpt. P, app. 1). The SSA stated that the change "does not affect the actual medical definition of the disorder or available programs or services." *Id.* at 46,500. Thus, the amendment does not effect a substantive change,

communication, self-care, and social skills. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 40 (4th ed. 2000) ("DSM-IV-TR"). "The term 'adaptive behavior' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." POMS DI 24515.056D.

Here, as the ALJ correctly found, the record demonstrates that Plaintiff's impairments also cannot be said to meet the criteria in section 112.05 because there is no persuasive evidence in this case that he has an intellectual disability. (*Id.*, Tr. 18). The ALJ also noted that after Plaintiff turned eighteen, "special consideration was given to the impairments mentioned in sections 12.04, 12.05 and 12.08. The evidence, however, fails to show that the claimant's impairments have met the severity set forth in these sections of Appendix 1, or in any other sections, since he attained age 18." (*Id.*, Tr. 29). This is demonstrated by the clinical findings and opinions of the consultative psychological examining physicians, Plaintiff's daily living activities, social functioning, and the opinions of the state agency reviewing psychologists. (*Id.*, Tr. 49, 72–80, 83–91, 315–19, 344–47, 403–06).

For example, in April 2014, Dr. Reece performed a consultative psychological examination of Plaintiff. (*Id.*, Tr. 403–06). Dr. Reece's observations show that Plaintiff did not have Listing-level adaptive deficits prior to age twenty-two. At his consultative exam in 2014, when Plaintiff was eighteen years-old, Plaintiff did not report any mental functioning reason for why he could not work; rather, he reported he needed "more help" with his class work. (*Id.*, Tr. 403).

---

and for purposes of this pleading, the words "mental retardation" and "intellectual disability" have the same meaning and will be used interchangeably, as appropriate.

Similarly, Dr. Reece's mental status examination findings were mostly normal and further suggestive of an individual with good adaptive functioning. For example, upon mental status examination, Plaintiff was clean and neatly dressed, was cooperative, exhibited no impulsive behaviors, had "eye contact [that was] inconsistent with poor quality" and no "psychomotor retardation or agitation," and had adequate insight. (*Id.*, Tr. 404). Dr. Reece did, however, note a flattened affect and that Plaintiff was mildly to moderately dysphoric and anxious. (*Id.*) Dr. Reece diagnosed Plaintiff with an unspecified depressive disorder and an unspecified impulse control, disruptive and conduct disorder, not mental retardation. (*Id.*, Tr. 405). He further noted that Plaintiff reported adequate insight and unimpaired intellectual functioning. (*Id.*, Tr. 406).

Also significant, Dr. Reece opined that Plaintiff's impairment did not affect his ability to understand, remember, and carry out instructions. (*Id.*, Tr. 409). Dr. Reece also concluded that Plaintiff's ability to intact with others was only mildly impaired. (*Id.*, Tr. 410), which is also significant evidence that Plaintiff was not disabled by intellectual disability. (Tr. 409–10). Moreover, Dr. Reece's assessed limitations were accommodated by the ALJ's mental RFC finding. (Tr. 30, 406, 409–10). The ALJ's mental RFC finding is consistent with Dr. Reece's assessed limitations, and accommodates for any impairment in responding to work pressures as the ALJ's restrictive RFC finding that requires only simple, short instructions, making simple decisions and few work place changes. (*Id.*, Tr. 30). Taking all of this into account, substantial evidence supports the ALJ's determination that Plaintiff was not disabled by intellectual disability and therefore did not meet or equal the requirements of Listing 12.05(C).

## IV.    RECOMMENDED DISPOSITION

For the reasons stated, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.       PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**


Date:   April 24, 2017                        /s/ Kimberly A. Jolson
                                             KIMBERLY A. JOLSON
                                             UNITED STATES MAGISTRATE JUDGE